IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| RICHARD VELUZAT, | ) | |
| | ) | |
| Plaintiff, | ) | No. 3:12-cv-01229 |
| | ) | |
| v. | ) | Judge Nixon |
| | ) | Magistrate Judge Brown |
| WILLIAMSON MEDICAL CENTER, | ) | JURY DEMAND |
| | ) | |
| Defendant. | ) | |

## ORDER

Plaintiff Richard Veluzat was fired from his job as a pharmacist at Williamson Medical Center ("WMC") on November 1, 2011, allegedly in retaliation for his complaints about racial discrimination in his department. Veluzat sued WMC for retaliatory discharge and associational discrimination under 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964. Pending before the Court is Defendant WMC's Motion for Summary Judgment. (Doc. No. 35.) Veluzat failed to present evidence of pretext, therefore Defendant's motion is **GRANTED**.

I. BACKGROUND

*A. Factual History*

Plaintiff Richard Veluzat began work as a pharmacist for Defendant WMC in October 2001. (Doc. No. 35-1 at 48.) Janet Nock became the Director of Pharmacy in 2007. (Doc. No. 47-2 at 12–13.) According to Veluzat, Nock was an abusive manager who decimated employee morale—"everybody had problems with her." (Doc. No. 47-1 at 116.) Veluzat claims that Nock also discriminated, and condoned discrimination, against African-American and Hispanic employees in the department. (*See, e.g.*, Doc. No. 47-1 at 115–17, 224.) Veluzat states that he reported specific incidents of discrimination to Nock, other managers, and representatives of

1

Gallagher Benefit Services, Inc. ("Gallagher"), a consulting group hired to assess employee satisfaction with workplace conditions at WMC. Veluzat believes he became Nock's "special target" because of his relationship to African American employees and he was unfairly disciplined and ultimately fired in retaliation for reporting discrimination against them. (*Id.* at 117.) Veluzat asserts that he voiced concerns about discrimination in the pharmacy on a number of occasions from 2007 to 2011:

> (1) In early 2007, Nock made all employees read aloud from meeting minutes during staff meetings; some African-American employees told Veluzat that they found this behavior offensive and "reminiscent [of] Jim Crow Laws." Veluzat reported this to Julie Miller, WMC's Assistant Chief Operating Officer.[1] (*Id.* at 237–40.)
>
> (2) In the spring of 2008, Ruby Matthews, an African-American woman, approached Veluzat and complained that Nock "was constantly treating her like a child, and demeaning her and raising her voice, making [her] do the work of two people." (*Id.* at 212.) According to Veluzat, "[Matthews] said that slavery ended a hundred years ago," Veluzat told Nock about these remarks, and Nock responded "I'm done with you." (*Id.* at 212–14.) Nock denies that Veluzat ever complained about race discrimination to her. (Doc. No. 47-2 at 41.)
>
> (3) In July 2009, Yvette Bean, an African-American woman, emerged from a sterile room wearing a blue bonnet worn to protect pharmacy products from contamination. Rhonda Demonbreun, a white woman, said, "[L]ook at her, she looks like a black smurf." (Doc. No. 47-1 at 226–27.) Veluzat did not report the incident, but he encouraged Bean to report it. (*Id.* at 227–28.)
>
> (4) In the fall of 2009, Matthews told Veluzat that Nock "doesn't like black people," a belief Veluzat thought was based on Nock's poor treatment of Matthews and some other pharmacy employees that day. (*Id.* at 219.) Ysella Torrez replied, "[S]he doesn't like brown people either, unless they're cleaning her house." (*Id.*) Veluzat states that he related both statements to Steve Pruter, then the Assistant Director of Pharmacy, but Pruter took no action. (*Id.* at 219–21.) Pruter does not recall this incident or any reports of discrimination allegedly made by Veluzat. (Doc. No. 35-6 at 6.)
>
> (5) In 2010, Nock criticized Andrea Goodsen's "appearance, her earrings and her

---

[1] Miller became the Chief Operating Officer of WMC before Veluzat's termination, but the date of her promotion is not in the record. (*See* Doc. No. 47-2 at 27.)

2

hairstyle. And she thought that was inappropriate because she didn't see anything that much different than other people of color's hairstyle and earrings, and dress." (Doc. No. 47-1 at 224.) Veluzat claims he probably told Pruter about Goodsen's complaints, but does not remember. (*Id.*)

(6) In a June 2010 meeting with Human Resources Director Tim Burton to discuss a disciplinary action against him, Veluzat told Burton it was unfair that he was being disciplined because he had tried to "protect . . . co-workers who have been hysterical and calling me crying because of the way [Nock]'s talked to them because of the color of their skin." (*Id.* at 181.) According to Burton, Veluzat never reported any concern that employees were mistreated because of their race. (Doc. No. 47-4 at 49.)

(7) In 2009, Bean was "having trouble" with Joann Kolb, who complained that Bean's "perfume or soap or something" was causing her to have asthma attacks. (Doc. No. 47-1 at 233.) Nock asked Bean to enter the pharmacy through the back door, wash all of her clothes with hypoallergenic detergent, and avoid perfume. Some of the other employees "decided to see if Joann had an issue with Yvette because she was black, as some of them speculated. So another employee wore Yvette's body spray perfume and Joann commented that she smelled really good." (*Id.*)

Veluzat did not report this development to Nock, though he asserts that he told the Gallagher representatives about the incident during the 2011 survey. (*Id.* at 247.) He claims he also reported that Nock maintained a "very upsetting environment, and that it was emotionally hurting employees and it seemed to be especially African American employees that she didn't like." (*Id.* at 243, 247.)

Although the Gallagher study notes that a representative met with Veluzat and describes the concerns he relayed during that conversation, the study does not indicate that Veluzat was concerned about racial discrimination in the pharmacy. (Doc. No. 53 at 5.) Marlene Cole, the Gallagher representative who met with Veluzat, does not recall Veluzat making any report of race discrimination within the pharmacy. (Doc. No. 47-3 at 19–20.)

(8) In September or October 2011, ten days before his annual review was due, Veluzat told Pat Guy, the liaison between Nock and the pharmacy employees, that Nock "did not like black people . . . [and that] Ysella had said she doesn't like brown people either." (Doc. No. 47-1 at 192.)

(9) Nock was replaced by Joanna Merritt in October 2011. That month, Veluzat told Merritt how "the employees, especially African American employees, had been given a hellish time at times." (*Id.* at 113.) According to Veluzat, Merritt responded, "[T]his place needs more men . . . this place is kind of a nest of pit vipers, isn't it?" (*Id.* at 114.) Merritt, on the other hand, claims

3

that she was unaware of any concerns about race discrimination in the pharmacy department until this litigation began. (Doc. No. 47-6 at 22–23.)

Veluzat alleges that "[i]n 2010, Defendant began to single Plaintiff out, gave him write-ups and accused him of not being a 'team player,'" and ultimately terminated him on November 1, 2011, in retaliation for these complaints.[2] (Doc. No. 60 at 23–24.) In his briefings, Veluzat first argues that he received a reprimand for failing to train a co-worker and that this reprimand was retaliatory. (*See id.* at 23.) Veluzat's employee file reflects a note from Nock on February 2, 2009, reminding Veluzat to train Jenny Angus to substitute for him while he attended a conference. (Doc. No. 35-1 at 63.) Veluzat felt that this criticism was "contrived" (Doc. No. 47-1 at 156) because Nock gave Veluzat "zero time on the schedule to train anybody. And [Nock] always put all training time on the schedule" (*id.* at 148–49). However, when asked whether he felt this constituted retaliation by Nock, Veluzat responded "I wouldn't say retaliate. I would just say make drama." (*Id.* at 148.)

Veluzat also claims that Nock approved a request for reimbursement and paid time off for him to attend a seminar, but when Nock became frustrated that Veluzat had not "supported [his] co-workers" because, according to Veluzat, he "expressed concern to her that one of them was making errors and was teaching another one," Nock retracted her approval.[3] (*Id.* at 42.) Furthermore, Veluzat contends that he started teaching

---

[2] In his Response in Opposition to Defendant's Motion for Summary Judgment, Veluzat contends that the retaliation began in 2010 (Doc. No. 60 at 23); however, in a section entitled "The Retaliation against Plaintiff and Final Termination" found in the same brief, Veluzat describes events that took place in 2009 (*id.* at 7–13). Because Plaintiff has not clearly indicated when he believes the retaliation began and because Plaintiff has not established a clear timeline of events, this Court addresses all potentially retaliatory conduct described by Veluzat during his deposition that took place after his first alleged complaints about race discrimination in 2007.

[3] Veluzat does not explain when this seminar was scheduled to occur (Doc. No. 47-1 at 42), nor does he provide dates for the PowerPoint incidents or the occasions when Nock yelled at him for his decisions made "subjectively based on [his] years of experience" and described below (*id.* at 47–51).

patients about their medications in 2007, a task he enjoyed until Nock reassigned it to Clinical Manager Haley Peel and Jenny Clayton. (*Id.* at 43.) Although this did not change Veluzat's compensation, it did result in "less quality of work and reward." (*Id.*) On another occasion, Veluzat claims that Nock instructed other employees to put their names on PowerPoint presentations that Veluzat created; he found it "demoralizing" that his work was attributed to someone else. (*Id.* at 48–49.) Veluzat notes "a couple of times" when Nock "would give me orders [for medications] that I had processed in the evening, and based on a decision I would make subjectively but based on my years of experience, she would say, well, you should have done this differently. And she would kind of yell at me and demean me." (*Id.* at 51.)

Additionally, Veluzat claims that "Nock singled [him] out . . . for violating departmental policies that were selectively enforced against him." (Doc. No. 60 at 23.) On February 7, 2010, Veluzat states that he left WMC at 2:00 p.m. and "told all the secretaries on every floor that [he] had [his] phone and [was] on-call." (Doc. No. 47-1 at 158.) Although Veluzat contends that this was normal behavior and he "never" called his managers before going home during an on-call shift (*id.* at 160), he was reprimanded for ending his on-call availability early but submitting a time sheet for a full shift (Doc. No. 35-1 at 64). Finally, Veluzat insinuates that the "write-ups" he received were unfounded and retaliatory. (*See, e.g.*, Doc. No. 60 at 8–13, 23.)

WMC, on the other hand, argues that Veluzat was disciplined according to WMC policy for legitimate nondiscriminatory reasons, including unprofessional communications with other employees and undermining the authority of a supervisor. (Doc. No. 36 at 1.) According to WMC, Veluzat was ultimately terminated for insubordination and falsifying a time card. (*Id.*)

5

The parties agree that "[f]alisification of time records is a basis for immediate termination of employment under [WMC] policy." (Doc. No. 50 at 9–10.)

WMC's Performance Accountability Policy outlines the steps the hospital follows to advise employees of performance issues and encourage behavior change. (Doc. No. 35-1 at 36.) Although the steps are listed sequentially and may lead to termination, "an employee is [not] entitled to any lesser level of intervention before a more severe level is imposed. Critical offenses involving serious violations of facility rules . . . may justify immediate discharge without regard to the employee's length of service or prior conduct." (*Id.*) The first step is a "Coaching," or a conversation that is a "routine part of the employee's shift." (*Id.* at 37.) The second step is a "Performance Accountability Discussion," or a "serious and planned discussion . . . about the need to correct ongoing performance issues." (*Id.*) If the employee fails to correct his performance following one or more Performance Accountability Discussions, the next step is a "Memo of Accountability," which has the stated goal of gaining agreement from the employee to meet performance expectations. (*Id.*) The employee is required to sign the Memo of Accountability, and the employee is ineligible to transfer to another position for twelve months. (*Id.* at 38.)

If the employee still fails to meet performance goals, the next step is the "Day of Decision," the penultimate disciplinary step before termination. (*Id.*) A manager must obtain permission from Human Resources before initiating the Day of Decision, a meeting between the employee and manager regarding the employee's disciplinary issues followed by a paid day off work for the employee, during which time the employee must "make a final decision to solve the immediate problem and make a total commitment to fully acceptable performance in every area" commemorated in a written "Statement of Commitment." (*Id.*) An employee that fails to abide

by his Statement of Commitment and Day of Decision memo may be terminated at any point within eighteen months of the Day of Decision. (*Id.*) Moreover, an employee is ineligible for a raise within a year, and ineligible for transfer within eighteen months, of the Day of Decision. (*Id.*) The final step in the WMC disciplinary process is termination, which may be initiated with prior approval from Human Resources if the employee fails to abide by his Statement of Commitment or Day of Decision agreement. (*Id.*)

Veluzat received at least one coaching relating to communications problems. On August 7, 2009, Veluzat told Demonbreun that he "had to go to a meeting with [his] colleague in nutrition support" and left the pharmacy. (Doc. No. 47-1 at 37.) The meeting was not on the schedule. (*Id.*) Assistant Clinical Coordinator Kim Heath conducted a coaching with Veluzat, advising him that "absences from the pharmacy need to be on the schedule." (Doc. No. 35-1 at 53; Doc. No. 35-8 at 6.) After Veluzat sent an email to Nock complaining that Demonbreun had "tattled on [him] like a child" (Doc. No. 35-1 at 54), Nock and Burton met with Veluzat to discuss the incident (Doc. No. 35-1 at 63). WMC claims that they discussed Veluzat's feeling that his colleagues did not respect him and the communication breakdown that occurred as a result of his "frustration and not stating where [he was] going" that day. (Doc. No. 35-1 at 63.) Veluzat, on the other hand, contends that the discussion was about Demonbreun's behavior, which he later described as "bullying." (Doc. No. 47-1 at 155.)

Nock conducted a Performance Accountability Discussion with Veluzat in February 2010 to discuss his communication with other employees. (Doc. No. 47-1 at 152.) Nock's Memo regarding this discussion, which Veluzat claims was generated because "someone must have asked her to put all of . . . her ideas of my deficits together" (*id.* at 152), listed Veluzat's previous performance issues, including the August 7, 2009, incident described above and an incident in

7

August 12, 2009, in which Nock states that Veluzat did not communicate sufficiently with the other pharmacists for them to understand what work Veluzat had done relating to certain patients (Doc. No. 35-1 at 64). The memo also listed more recent communications failures, including the February 7, 2010, incident wherein WMC contends that Veluzat ended his on-call availability early but "submitted time for . . . on-call pay" for the full shift and his February 2009 reprimand for failing to train Jenny Angus. (*Id.* at 63–64.)

Nock issued a Memorandum of Accountability to Veluzat on June 14, 2010, following a series of incidents that, according to WMC, demonstrated Veluzat's ongoing communications problems. (Doc. No. 35-1 at 76.) Burton wrote the Memorandum. (Doc. No. 35-4 at 6.) Angela Dyer, another WMC pharmacist, complained to Nock that a patient called Veluzat during an evening shift because the patient did not know how much medication to take; the patient told Dyer that she never received a call back from Veluzat with the correct information. (Doc. No. 35-1 at 71.) Dyer wrote to Nock that these lapses in communication have been a problem in the past "and really it always comes back to the same person," Veluzat. (*Id.*) Veluzat admits that he gave Dyer's personal cellphone number to a patient around the same time period, in violation of WMC policy. (Doc. No. 47-1 at 171, 265–66; Doc. No. 35-8 ¶ 2.) Veluzat claims that Dyer was "scapegoating" him in both instances because she caused the communication problem by leaving work early without telling him. (Doc. No. 47-1 at 50–51, 177.) However, Veluzat does not believe that Dyer's complaint to Nock constituted retaliation; instead, he stated "she was just presenting something to Janet [Nock]." (*Id.* at 169.)

Additionally, on June 1, 2010, Dr. Titus Daniels wrote to Nock to express concerns about Veluzat's administration of antibiotics to a patient. (Doc. No. 35-1 at 73.) Veluzat does not believe that Dr. Daniels was retaliating against him by sending this email. (Doc. No. 47-1 at

8

172.) When Nock provided Veluzat with a printed copy of the email and a note stating that she wanted to discuss the matter with him, Veluzat emailed an "in-depth commentary" to Nock and Dr. Daniels explaining himself, noting that he "polled several pharmacists informally" and they all agreed with his actions, complaining that Dr. Daniels's orders were unclear, and concluding "after several similar incidents recently that I will ask that pharmacists finish their problems before they leave in the afternoon, so that I am not dumped on and left responsible for making decisions that perhaps pharmacists didn't want to make earlier in the day." (Doc. No. 35-1 at 74–75.) In the Memorandum of Accountability, Nock described this email as "inappropriate" and faulted Veluzat for "pointing fingers and blaming others rather than accepting responsibility." (Doc. No. 35-1 at 76.)

Veluzat contested and refused to sign the Memorandum of Accountability. (*Id.* at 77.) He claims Nock "contrived a lot of stuff to make [him] look like [he's] not a team player." (Doc. No. 47-1 at 104.) Nock escalated the issue to Burton, who states that he issued Veluzat's Day of Decision because Veluzat refused to sign the Memorandum and take responsibility for his actions. (Doc. No. 35-4 at 7.) Veluzat signed a Statement of Commitment on June 29, 2010, indicating that he chose "to solve the immediate problem and make a total commitment to acceptable performance in every area." (Doc. No. 35-1 at 78.) Veluzat claims Burton issued the day of decision "because [he] wouldn't sign [Nock's] assessment," that he told Burton he didn't feel comfortable signing because he had not done "anything really bad" and he had "tried to protect patients and co-workers who have been hysterical and calling me crying because of the way [Nock] talked to them because of the color of their skin," and that Burton apologized to him the next day and told him that "the day of decision wasn't based on . . . performance." (Doc. No. 47-1 at 104, 181.) Burton denies that Veluzat reported discrimination. (Doc. No. 47-4 at 49.)

Nock conducted Veluzat's annual review on October 27, 2010. (Doc. No. 35-1 at 48.) She found Veluzat met or exceeded expectations in all performance categories. (*Id.* at 50.) Nock noted that since his Day of Decision, "an improvement in [Veluzat's] communication with peers, MSS Team and other staff, has been noted." (*Id.* at 51.) Veluzat contests Nock's assessment; he claims he "always did a good job and I don't think I improved" and stated that Nock's request that he improve documentation of his work was "almost unrealistic" because there was not enough time to do so. (Doc. No. 47-1 at 101–02, 107.) At his deposition, Veluzat could not recall whether he received a raise in 2010, but noted that he did receive a raise every year that other hospital employees received raises. (*Id.* at 105.)

When WMC's supply of a particular electrolyte formula ran low in September 2011, Clinical Manager Peel made the decision to borrow some from another hospital pending the delivery of new supplies. (Doc. No. 35-10 ¶ 3.) Veluzat told Peel he did not agree with her decision and asked if the borrowed formula could be returned. (*Id.*) Veluzat stated "I think Haley took it personally, but I always liked Haley . . . I didn't feel like that was a criticism." (Doc. No. 47-1 at 196–97.) When Peel refused to return the product, Veluzat approached a dietitian in Metabolic Support Services ("MSS") to ask if the formula could be returned; his "body language toward [the] member of the MSS team was interpreted as being condescending toward Haley and her decision-making skills." (Doc. No. 35-1 at 90; *see* Doc. No. 47-6 at 30–31.) Merritt met with Peel and Veluzat to discuss the incident, but Peel felt this was insufficient so Guy began an investigation of the problem. (Doc. No. 47-6 at 38.)

During the investigation, Nancy Thomas reported that Veluzat was scheduled for a training course, discovered the course was cancelled, asked Thomas to "cover" for him, then did not return to work until the scheduled training should have ended. (*Id.* at 38–39.) Veluzat

10

reported that he worked those hours, and he was paid for those hours. (*Id.* at 39.) When asked what steps he took to correct his time records, Veluzat stated "I really didn't think I missed the class because I spent my time registering for it." (Doc. No. 47-1 at 201.) He also stated that he "didn't think about [modifying his time card]" because "it was electronic." (*Id.* at 202.) Falsifying time records is grounds for immediate termination at WMC. (Doc. No. 50 ¶ 15.)

Veluzat was fired from WMC on November 1, 2011, for falsifying a time record and insubordination. (Doc. No. 35-1 at 90.) Veluzat sent an email that day to Human Resources Director Phyllis Molyneux and complained that he was "accused of 'not being a team player' in a context where [he] was not treated as a member of the team on a matter of significance," faulted Peel for "aggressively" making her decision with "an ambitious tone," and claimed that he was "now being pursued in retaliation" for his interactions with Peel. (Doc. No. 35-1 at 91.)

*B. Procedural History*

Veluzat filed his Complaint against WMC on November 27, 2012, alleging violations of 42 U.S.C. § 1981 and Title VII of the Civil Rights Act of 1964, and seeking compensatory damages, punitive damages, and costs and fees. (Doc. No. 1 at 7, ¶¶ 27–38.) WMC filed its Amended Answer on October 2, 2013. (Doc. No. 18.) On June 13, 2014, WMC filed a Motion for Summary Judgment (Doc. No. 35), as well as a Memorandum of Law in Support (Doc. No. 36) and twelve exhibits (Doc. Nos. 35-1–12). WMC filed a Corrected Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment on June 25, 2014. (Doc. No. 41.) Veluzat filed his Response in Opposition to Defendant's Motion for Summary Judgment on July 28, 2014 (Doc. No. 60) and eight exhibits (Doc. Nos. 47-1–8). He also filed a Response to WMC's Statement of Undisputed Material Facts (Doc. No. 50) and a Statement of Facts (Doc. No. 51). WMC filed a Reply (Doc. No. 61) with four exhibits (Doc. Nos. 61-1-4).

11

II. LEGAL STANDARD

Summary judgment is rendered when "there is no genuine dispute as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The party moving for summary judgment bears the initial burden of showing that there is no material issue in dispute." *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "Once a moving party has met its burden of production, 'its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Blizzard v. Marion Technical Coll.*, 698 F.3d 275, 282 (6th Cir. 2012) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he is ruling on a motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). "Reviewing the facts in the light most favorable to the nonmoving party, the court must ultimately determine whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Blizzard*, 698 F.3d at 282 (internal citations and quotations omitted).

III. ANALYSIS

*A. Retaliation Claim*

Title VII of the Civil Rights Act of 1964 ("Title VII") prohibits discrimination as to the terms or conditions of employment on the basis of race or national origin.[4] 42 U.S.C. § 2000e-2(a)(1) (2012). Title VII's anti-retaliation provision prohibits an employer from retaliating against an employee "because he has opposed any practice made an unlawful employment

---
[4] Veluzat also asserts his claims under 42 U.S.C. § 1981. Title VII and § 1981 claims are analyzed pursuant to the same standards. *Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 756 (6th Cir. 2012).

practice by this [Act]." 42 U.S.C. § 2000e-3(a). Veluzat claims that he complained about race discrimination faced by WMC employees and that he was fired in retaliation for those complaints in violation of Title VII.

Under Title VII, a plaintiff may prove retaliation with either direct or circumstantial evidence. *Imwalle v. Reliance Med. Prods, Inc.*, 515 F.3d 531, 544 (6th Cir. 2008). Veluzat presents no direct evidence of retaliation and seeks to prove his claim through circumstantial evidence alone. (Doc. No. 60 at 18.) Claims based on circumstantial evidence are analyzed under the *McDonnell Douglas* burden-shifting framework. *Imwalle*, 515 F.3d at 544. First, the plaintiff must establish a prima facie case of retaliation by showing that (1) he engaged in protected activity, (2) his activity was known to the Defendant, (3) the Defendant took "materially adverse" action against the Plaintiff, and (4) the protected activity was the but-for cause of the adverse action against the Plaintiff. *Id.*; *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013). If the plaintiff establishes a prima facie case, the burden shifts to the defendant to establish a legitimate, non-retaliatory reason for its actions against the plaintiff. *Imwalle*, 515 F.3d at 544. If the defendant meets this burden, "the plaintiff must then demonstrate by a preponderance of the evidence that the legitimate reason offered by the defendant was not its true reason, but instead was a pretext designed to mask retaliation." *Id.* (citing *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 862 (6th Cir.1997)).

1. <u>Materially Adverse Actions</u>

Assuming for the purposes of this motion that Veluzat has established the first two prongs of a prima facie case—that his complaints constituted protected activity and that WMC was aware of his complaints—Veluzat must next establish that WMC took materially adverse action against him. Retaliatory actions are cognizable under Title VII only if they are

13

"materially adverse," or when the actions would "dissuade[] a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotations omitted). "The standard is the 'reactions of a *reasonable employee*,' not the plaintiff . . . in view of 'the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings.'" *Lahar v. Oakland Cnty.*, 304 F. App'x 354, 357 (6th Cir. 2008) (quoting *Burlington*, 548 U.S. at 68–69). "[P]etty slights, minor annoyances, and simple lack of good manners will not create such deterrence." *Burlington*, 548 U.S. at 68. Nor will reprimands, lowered performance evaluations, or changed job responsibilities unless they "significantly impact an employee's wages or professional advancement." *Lahar*, 304 F. App'x at 357 (citation omitted); *Blizzard*, 698 F.3d at 290.

Termination is the quintessential adverse action. *See Burlington*, 548 U.S at 62. However, most of the other allegedly retaliatory actions cited by Veluzat constitute "petty slights." Veluzat cites the following incidents without providing any evidence of their effect: (1) he was denied reimbursement and the opportunity to attend a seminar, (2) he was reassigned from his patient education responsibilities, (3) Nock demeaned him when she did not agree with how he filled pharmacy orders, (4) Nock directed other employees to take credit for training materials he created, and (5) he was coached for leaving the pharmacy for an unscheduled meeting. Because Veluzat does not present any evidence that these incidents had any impact on his wages or opportunities for professional advancement, they are not materially adverse.

Veluzat also claims that his Performance Accountability Discussion with Nock in February 2010 was retaliatory. However, Veluzat presents no evidence that this discussion had a material impact on him or that it would dissuade a reasonable employee from making or supporting a charge of discrimination. The only relevant evidence in the record supports the

14

opposite conclusion. According to WMC's Performance Accountability Policy, a Performance Accountability Discussion has no impact on an employee's pay or potential for promotion. (*See* Doc. No. 35-1 at 37.)

The Memorandum of Accountability and Day of Decision, on the other hand, are closer cases. The Memorandum of Accountability marks the beginning of the "final stages of the accountability process," and "[o]nly one . . . is issued before the next step, which is Day of Decision," the last step before termination. (*Id.*) An employee is ineligible for transfer to another position within a year of receiving a Memorandum of Accountability. (*Id.*) Furthermore, a Day of Decision makes an employee ineligible for a transfer or a raise and any subsequent disciplinary infraction within eighteen months could result in termination. (*Id.*) Veluzat presents no evidence that he actually suffered any of these consequences; in fact, he received a raise every year that other hospital employees received raises. However, the Memorandum of Accountability and Day of Decision threaten termination for any future disciplinary infractions. These threats could dissuade a reasonable employee from making or supporting a charge of discrimination. Therefore, this Court finds that the Memorandum of Accountability and Day of Decision also constitute materially adverse actions.

   2. Pretext

Assuming that Veluzat suffered three materially adverse actions—a Memorandum of Accountability, a Day of Decision, and termination—and established the other elements of his prima facie case, the burden shifts to WMC to state a legitimate, non-retaliatory reason for its actions against Veluzat. *See Imwalle*, 515 F.3d at 544; *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 596 (6th Cir. 2007). WMC states that it issued a Memorandum of Accountability because Veluzat did not communicate effectively with patients, gave Dyer's personal cellphone

number to a patient, and sent an unprofessional email to Nock and Dr. Daniels. According to WMC policy, an employee is required to sign the Memorandum of Accountability; however, Veluzat refused to sign the Memorandum, so WMC issued his Day of Decision. Finally, WMC states that Veluzat was terminated because he was insubordinate to Peel and because he falsified a time record. WMC has therefore proffered non-retaliatory reasons for each adverse action.

Because WMC has proffered a non-retaliatory reason for each adverse action, the burden shifts to Veluzat to present some evidence that WMC's proffered reasons are pretextual. *Imwalle*, 515 F.3d at 544. Typically a plaintiff does so by presenting evidence "that (1) the employer's stated reason for [taking adverse action against] the employee has no basis in fact, (2) the reason offered for [taking adverse action against] the employee was not the actual reason for the [adverse action], or (3) the reason offered was insufficient to explain the employer's action." *Id.* at 545 (quoting *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir.1994)). "[T]o survive summary judgment a plaintiff need only produce enough evidence to support a prima facie case and to rebut, but not to disprove, the defendant's proffered rationale." *Griffin v. Finkbeiner*, 689 F.3d 584, 593 (6th Cir. 2012) (quotation omitted).

Veluzat fails to present evidence to support any of these theories. First, Veluzat does not dispute the factual basis of the disciplinary actions against him. Although he believes that the communication problem with patients was Dyer's fault, he admits that he gave Dyer's phone number to a patient and that he sent the email to Dr. Daniels. Even if Veluzat is correct and the communication problem was Dyer's fault, Veluzat does not contend that his decision to disclose Dyer's phone number and his decision to write to Dr. Daniels were insufficient on their own to justify the issuance of the Memorandum of Accountability. Moreover, he admits that he refused to sign the Memorandum of Accountability. According to WMC policy, the employee must sign

the Memorandum of Accountability or face further disciplinary actions. Finally, although he characterizes his communication with Peel as a misunderstanding, not insubordination, Veluzat admits that he did not attend the training class on the scheduled day but was paid for the training time, and he agrees that falsifying time cards is grounds for termination.

Second, Veluzat does not present any evidence that WMC's stated reasons were not its real reasons for taking disciplinary action against him. Under this method of establishing pretext, the plaintiff typically "admits the factual basis underlying the employer's proffered explanation and further admits that such conduct *could* motivate dismissal, but attempts to indict the credibility of his employer's explanation by showing circumstances which tend to prove that an illegal motivation was *more* likely than that offered by the defendant." *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003) (emphasis in original, internal quotations omitted) (quoting *Manzer*, 29 F.3d at 1084). Here, Veluzat claims that "Nock was contriving these issues so that she could fire [him]" but points to no evidence other than a comment by Kim Heath that Nock was "trying to establish a case against" him (Doc. No. 47-1 at 178) and a comment by Meg Brock that Stephanie Bourque told her that Nock was responsible for Veluzat's termination (*id.* at 206–07). Assuming these comments are not inadmissible hearsay, neither establishes that Nock had any motive for wanting to "get rid of" Veluzat beyond the reasons that support his disciplinary actions: his track record of poor communication skills and inappropriate behavior. Neither comment connects Veluzat's termination to his alleged complaints about racial discrimination in the pharmacy.

Third, Veluzat presents no evidence that the proffered reasons were insufficient to motivate his termination. Under this method of establishing pretext, the plaintiff typically presents "evidence that other employees, particularly employees not in the protected class, were

17

not [subject to adverse action] even though they engaged in substantially identical conduct to that which the employer contends motivated its [action against] the plaintiff." *Johnson*, 319 F.3d at 866 (quoting *Manzer*, 29 F.3d at 1084). Although Veluzat vaguely alleges that other WMC rules were selectively enforced against him, he does not point to any instance in which any other WMC employee engaged in the same or similar conduct and escaped disciplinary action. Furthermore, even though Veluzat explains why he did not modify his time card, he agrees that he submitted time records, was paid for hours he did not work, and that falsification of time records is grounds for immediate termination under WMC policy. Veluzat fails to explain why this is insufficient to justify termination.

Finally, Veluzat presents no other evidence to establish that the real reason for the adverse actions taken against him was retaliation. Because Veluzat presents no evidence that WMC's actions against him were a pretext for illegal discrimination, he has failed to establish a genuine issue of material fact at this stage of his retaliation claim. WMC's Motion for Summary Judgment on Veluzat's retaliation claim is **GRANTED**.

*B. Associational Discrimination Claim*

Veluzat also argues that he suffered from associational discrimination, or "that he was discriminated [against] on the basis of his association with a member of a recognized protected class," in this case African-American pharmacy employees. *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 574 (6th Cir. 2000). Claims of associational discrimination based on circumstantial evidence alone are analyzed under the *McDonnell Douglas* burden-shifting framework: the plaintiff must first establish a prima facie case of discrimination; the defendant must then provide a legitimate, non-discriminatory reason for taking adverse action against the plaintiff; and finally the plaintiff must put forth evidence of pretext, or evidence "that the employer's explanation was

fabricated to conceal an illegal motive." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009). As described above, Veluzat has failed to present evidence of pretext. WMC's Motion for Summary Judgment on this claim is therefore **GRANTED**.

## IV. CONCLUSION

For the reasons stated above, Defendant's Motion for Summary Judgment (Doc. No. 35) is **GRANTED**.

It is so ORDERED.

Entered this the 3rd day of November, 2014.

                                                                                  _____
                                                                                  JOHN T. NIXON, SENIOR JUDGE
                                                                                  UNITED STATES DISTRICT COURT